UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

BARBARA DAVIS,
N3284 Bungert Lane
Hortonville, Wisconsin 54944

   Plaintiff,      Case No. 26-cv-788

  v.         **JURY TRIAL DEMANDED**

LSC COMMUNICATIONS BOOK LLC
d/b/a LAKESIDE BOOK COMPANY,
4101 Winfield Drive
Warrenville, Illinois 60555

   Defendant.

## COMPLAINT

   COMES NOW Plaintiff, Barbara Davis, by her counsel, WALCHESKE & LUZI, LLC, and as and for her claims against Defendant, LSC Communications Book LLC, alleges and shows to the Court as follows:

### JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 ("ADAA" or "ADA/ADAAA"), 42 U.S.C. § 12101, *et seq*.

2.  Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Winnebago County, Wisconsin, which lies within this District.

3.      The Green Bay Division is the proper division of this District because the events and omissions giving rise to this action occurred principally in Winnebago County, Wisconsin.

## PARTIES AND COVERAGE

4.      Plaintiff Barbara Davis is an adult individual who, at all times relevant hereto, resided at N3284 Bungert Lane, Hortonville, Wisconsin 54944.

5.      Defendant LSC Communications Book LLC d/b/a Lakeside Book Company ("Defendant" or "Lakeside Book") is a limited liability company organized under the laws of the State of Illinois, with its principal office located at 4101 Winfield Drive, Warrenville, Illinois 60555.

6.      At all times relevant hereto, Defendant owned, operated, and managed a manufacturing and fulfillment facility located at 800 Midway Road, Menasha, Wisconsin 54952, at which Plaintiff was employed.

7.      At all times relevant hereto, Defendant employed fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year, and therefore qualifies as an "employer" as defined by the ADA/ADAAA, 42 U.S.C. § 12111(5).

8.      Defendant is a covered employer for purposes of the ADA/ADAAA.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.      On or about April 20, 2023, Plaintiff filed an employment discrimination complaint with the Wisconsin Equal Rights Division ("ERD"), designated ERD Case No. CR202301172, alleging disability discrimination and failure to accommodate. Plaintiff's complaint was cross-filed with the Equal Employment Opportunity Commission ("EEOC") as Charge No. 26G-2023-00802).

10. On or about August 11, 2023, Plaintiff filed a second employment discrimination complaint alleging disability discrimination and termination based on disability with the ERD, designated ERD Case No. CR202302264. Plaintiff's second complaint was cross-filed with the EEOC as Charge No. 26G-2023-01316.

11. On February 4, 2026, the EEOC issued a Notice of Right to Sue to Plaintiff for EEOC Charge No. 26G-2023-00802, entitling Plaintiff to bring a civil action within ninety (90) days of receipt thereof.

12. On February 4, 2026, the EEOC issued a Notice of Right to Sue to Plaintiff for EEOC Charge No. 26G-2023-01316, entitling Plaintiff to bring a civil action within ninety (90) days of receipt thereof.

13. Plaintiff has satisfied all applicable administrative prerequisites and all conditions precedent to filing this action. This Complaint is timely filed within ninety (90) days of Plaintiff's receipt of both Notices of Right to Sue.

## GENERAL ALLEGATIONS

### A. Plaintiff's Employment with Defendant

14. On or about July 6, 2004, Defendant hired Plaintiff as a Forklift Operator at Defendant's facility located at 800 Midway Road, Menasha, Wisconsin 54952.

15. In or around August 2008, Plaintiff began performing Mail Bench duties on a backup basis.

16. On or about February 8, 2019, Plaintiff transitioned to full-time Mail Bench work, a role in which she continued until approximately March 2022.

17. Throughout her nearly twenty (20) years of employment with Defendant, Plaintiff was a diligent, capable, and satisfactory employee.

### B. Plaintiff's Disabilities

18. Plaintiff has been diagnosed with and suffers from spinal stenosis, peripheral neuropathy, and overactive bladder (collectively, "her disabilities"), which substantially limit one or more of her major life activities, including but not limited to: walking, standing, bending, lifting, and normal bladder function.

19. Plaintiff's disabilities are permanent in nature.

20. Defendant was at all times relevant hereto aware of Plaintiff's disabilities.

21. Plaintiff is a "qualified individual with a disability" within the meaning of the ADA/ADAAA, 42 U.S.C. § 12111(8), in that, with reasonable accommodation, she could perform the essential functions of her existing position or of available alternative positions with Defendant.

### C. Defendant's Prior Accommodations of Plaintiff's Disabilities

22. On or about January 27, 2021, Defendant accommodated Plaintiff's disability-related limitations by providing her with a sit/stand desk at the Mail Bench.

23. In or around August 2021, Defendant further accommodated Plaintiff's disability-related needs by providing her with a designated parking spot at the facility.

24. These prior accommodations confirm Defendant's awareness of Plaintiff's disabilities and had previously taken steps to address her disability-related needs.

### D. Transfer Back to Forklift and Presentation of Permanent Medical Restrictions

25. On or about March 14, 2022, Defendant informed Plaintiff that the Kelly Press work—which had sustained her Mail Bench assignment—was ending, and that she would accordingly be transferred back to forklift operations.

26. On or about July 11, 2022, Plaintiff presented Defendant with a physician's note dated June 16, 2022, documenting permanent medical restrictions arising from her disabilities.

Those restrictions included: (1) first-shift work only; (2) hourly bathroom breaks due to her overactive bladder condition; (3) lifting limited to no more than twenty-five (25) pounds; and (4) no excessive bending or standing.

27. On or about July 15, 2022, while working at Defendant's Menasha facility, Plaintiff suffered a workplace injury when she sustained a concussion as a result of a forklift accident and was subsequently placed on work-related medical leave.

28. On or about August 5, 2022, Plaintiff's physician issued updated medical documentation clarifying that Plaintiff's restrictions were permanent, and consisting of: (1) first-shift work only; (2) hourly bathroom breaks due to overactive bladder; (3) lifting limited to no more than twenty-five (25) pounds; and (4) bending and standing limited to no more than fifteen (15) minutes per hour. These restrictions are permanent and will not improve.

29. On or about August 11, 2022, Plaintiff's work-injury-related restrictions were lifted; however, her personal, disability-related permanent restrictions described above remained fully in effect.

### E. Defendant's Failure to Engage in the Interactive Process and Provide Reasonable Accommodation

30. On or about August 8, 2022, Defendant's Human Resources representative informed Plaintiff that Defendant had no available work at the facility that fit within her permanent restrictions. Defendant did not, at that time or at any point thereafter, engage Plaintiff in any meaningful or good-faith interactive process to identify potential reasonable accommodations.

31. At all times relevant hereto, Plaintiff was a union member.

32. Between approximately August 15 and September 12, 2022, Defendant communicated with representatives of Plaintiff's union—District Council 1 - Local 77-P, GCC/IBT (the "Union")—concerning potential accommodations for Plaintiff's disabilities.

Defendant's supervisors Mariann Verhagen and Daniel Racette participated in these communications.

33. On or about September 12, 2022, Union Representative Scott Miller acknowledged that providing Plaintiff with a first-shift work assignment would affect her wages, hours, and other terms and conditions of employment under the then-applicable Collective Bargaining Agreement ("CBA"), and stated that the Union would not agree to such an arrangement.

34. During all times relevant hereto, the CBA between Defendant and the Union explicitly allowed for "bumping" based on seniority.

35. During all times relevant hereto, Defendant's union employees were allowed to "swap" or "trade" shifts with each other.

36. Defendant's obligation under the ADA/ADAAA to engage in the interactive process and provide Plaintiff with a reasonable accommodation is independent of and not superseded by the terms of any collective bargaining agreement.

37. Even where a CBA provision might otherwise impede a requested accommodation, an employer retains an independent obligation to attempt in good faith to work with the union to modify or waive that provision in order to permit the accommodation.

38. At all times relevant hereto, Defendant failed to make any meaningful effort to negotiate with the Union on Plaintiff's behalf to facilitate her accommodation.

39. On or about September 15, 2022, Defendant convened a three-way meeting with Plaintiff and Union representatives, at which Plaintiff was informed that Defendant could not accommodate her restrictions. No alternative accommodations or available positions were discussed, offered, or explored at this meeting.

40.     Following the September 15, 2022 meeting, Defendant excluded Plaintiff from the workplace and placed her on unpaid leave with no defined return date and no offer of alternative positions or accommodations.

41.     Throughout the period from August 2022 through Plaintiff's termination in July 2023, Defendant never: (a) directly met with Plaintiff individually to engage in a good-faith interactive accommodation process; (b) communicated information about job openings or vacancies to Plaintiff; (c) provided Plaintiff with a seniority list from which she could have identified available positions; or (d) offered Plaintiff any meaningful opportunity to apply for or be considered for available positions.

42.     Although Defendant failed to communicate any job openings to Plaintiff, coworkers independently submitted Plaintiff's name for consideration for at least two (2) available positions during this period.

43.     Defendant never contacted Plaintiff about any of the positions for which her coworkers submitted her name for consideration.

44.     During the period from August 2022 through Plaintiff's termination in July 2023, multiple positions were available at Defendant's Menasha facility, including but not limited to: (a) multiple Forklift Operator positions; (b) a Shipping Department Coordinator position; and (c) a Secretary position.

45.     With reasonable accommodation, Plaintiff could have performed the essential functions of one or more of the available positions listed in Paragraph 44, above.

### F. Continued Denial of Accommodation

46.     On December 29, 2022, counsel for Plaintiff sent Defendant a written demand letter requesting that Defendant accommodate Plaintiff's disabilities and return her to work in an appropriate position.

47.     In or around February and March 2023, counsel for Plaintiff specifically inquired about the availability of a first-shift Forklift Operator position for Plaintiff.

48.     On or about March 1, 2023, Defendant's in-house counsel confirmed that, following the conclusion of new CBA negotiations, straight second- and third-shift Forklift Operator positions were now available--an express acknowledgment that the successor CBA had relaxed the absolute mandatory-rotation requirement that Defendant had previously cited to deny Plaintiff's accommodation. Despite this development, Defendant continued to deny Plaintiff any accommodation or return to work in any available position.

### G. Rejection of Proposed Shift Trade and Termination of Plaintiff's Employment

49.     On or about June 23, 2023, Defendant sent Plaintiff a letter notifying her that Defendant would terminate her employment on July 25, 2023, absent "any updates on your condition or…an updated return to work from [her] doctor."

50.     In or around July 2023, a coworker employed by Defendant as a first-shift Forklift Operator agreed to trade shifts with Plaintiff. Under the proposed arrangement, Plaintiff would assume the coworker's first-shift forklift position, and the coworker would fill an open second-shift forklift position.

51.     The proposed arrangement as described in Paragraph 50, above: (a) required no displacement of any employee's contractual seniority rights; (b) was entirely consensual between

the two (2) employees involved; (c) required no modification of or waiver under any collective bargaining agreement; and (d) would have been operationally neutral to Defendant.

52. On or about July 12, 2023, Plaintiff proposed this shift-trade arrangement to the Union President, who raised no objection to the proposal.

53. On or about July 14, 2023, the Union President contacted Plaintiff and informed her that Defendant's Human Resources department had refused the proposed shift trade and that Plaintiff could not return to work unless and until her first-shift restriction was lifted by her physician.

54. By conditioning Plaintiff's return to work on the elimination of her permanent, physician-imposed medical restrictions, Defendant in effect required that Plaintiff demonstrate she was no longer disabled as a condition of continued employment—a condition that is unlawful under the ADA/ADAAA.

55. On or about July 25, 2023, Defendant terminated Plaintiff's employment.

56. In Defendants' termination letter dated July 25, 2023, stated, in part: "The company previously contacted you to let you know that we need to receive updated documentation or communication if you intended to return to work. Since we have not received any communication, we will be terminating your employment as of Tuesday, July 25th, 2023."

57. In its submission to the ERD on or about October 5, 2023, Defendant acknowledged that Plaintiff had remained on an unpaid leave of absence "pending an improvement in her condition and/or a change in her restrictions."

58. In its submission to the ERD on or about November 27, 2023, Defendant acknowledged that Defendant terminated Plaintiff's employment "because…the Company understood Complainant's restrictions to be unchanged and permanent."

59.     Defendant's admissions to the ERD as described in Paragraphs 57 and 58, above, establish that Plaintiff's termination was directly predicated on her disability and her permanent, disability-related restrictions.

60.     Defendant's conduct throughout the foregoing period—including its refusal to engage in a good-faith interactive process, its failure to negotiate with the Union to permit Plaintiff's accommodation, its failure to inform Plaintiff of available positions, its failure to provide any reasonable accommodation, its rejection of the July 2023 shift-trade proposal, and its termination of Plaintiff's employment on July 25, 2023—was motivated by and because of Plaintiff's disabilities.

## FIRST CAUSE OF ACTION – AMERICANS WITH DISABILITIES ACT
### (FAILURE TO ACCOMMODATE)

61.     Plaintiff reasserts and incorporates all paragraphs set forth above as if restated herein in their entirety.

62.     Plaintiff is a qualified individual with a disability within the meaning of the ADA/ADAAA, 42 U.S.C. § 12111(8). Her disabilities—spinal stenosis, peripheral neuropathy, and overactive bladder—substantially limit one or more of her major life activities, including walking, standing, bending, lifting, and normal bladder function.

63.     Defendant was at all times aware of Plaintiff's disabilities and the resulting permanent restrictions on her ability to work.

64.     Plaintiff requested reasonable accommodations for her disabilities, including but not limited to: (a) a first-shift work schedule; (b) hourly bathroom breaks; (c) a lifting restriction of no more than twenty-five (25) pounds; and (d) limitations on bending and standing to no more than fifteen (15) minutes per hour.

65.     Defendant failed and refused to engage in an interactive process with Plaintiff in good faith to identify and implement a reasonable accommodation for Plaintiff's disabilities, as required by 42 U.S.C. § 12112(b)(5)(A) and its implementing regulations at 29 C.F.R. § 1630.9.

66.     Reasonable accommodations existed that would have permitted Plaintiff to perform the essential functions of her existing position or an available alternative position, including but not limited to: (a) assigning Plaintiff to a first-shift Forklift Operator position; (b) approving the voluntary and seniority-neutral shift trade proposed by Plaintiff and her first-shift coworker in July 2023; (c) reassigning Plaintiff to another available and vacant position for which she was qualified, including but not limited to a Shipping Department Coordinator or Secretary position, pursuant to 42 U.S.C. §12111(9)(B); or (d) other reasonable schedule or work modifications.

67.     Defendant failed and refused to provide Plaintiff with any reasonable accommodation for her disabilities from August 2022 through the termination of her employment on July 25, 2023.

68.     The ADA/ADAAA's reasonable accommodation requirements are not superseded or limited by the terms of a collective bargaining agreement, and a union's refusal to consent to an accommodation does not relieve an employer of its independent statutory obligation. *See* 42 U.S.C. §12112(b)(5)(A); 29 C.F.R. §1630.9.

69.     Defendant was required to attempt in good faith to negotiate with the Union to permit Plaintiff's accommodation. Furthermore, the successor CBA then in effect undermines any CBA-based defense: Defendant acknowledged in March 2023 that the new CBA permitted straight second- and third-shift forklift assignments, demonstrating that the absolute rotating-schedule requirement had already been relaxed. If the CBA could accommodate straight-shift work on second and third shifts, there is no principled basis for concluding it could not similarly

accommodate a straight first-shift assignment for Plaintiff. Finally, the shift-trade arrangement proposed in July 2023—which the Union president did not oppose—required no CBA modification whatsoever and therefore presented a straightforward, CBA-compliant reasonable accommodation that Defendant refused without lawful justification.

70.     Defendant's failure to accommodate Plaintiff's disabilities caused Plaintiff to be excluded from the workplace and denied wages and benefits for approximately eleven (11) months—from August 2022 through July 25, 2023—constituting a continuing adverse employment action throughout that period.

71.     As a direct and proximate result of Defendant's intentional failure to accommodate her disabilities, Plaintiff has suffered and continues to suffer damages, including but not limited to: (a) lost wages and benefits; (b) lost future earning capacity; (c) emotional distress, mental anguish, pain, and suffering; (d) damage to her reputation and professional standing; and (e) other compensatory damages in amounts to be determined at trial.

72.     Defendant's conduct was intentional and was undertaken with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to an award of punitive damages pursuant to 42 U.S.C. § 1981a.

### SECOND CAUSE OF ACTION – AMERICANS WITH DISABILITIES ACT (DISCRIMINATORY DISCHARGE)

73.     Plaintiff reasserts and incorporates all paragraphs set forth above as if restated herein in their entirety.

74.     Plaintiff is a qualified individual with a disability within the meaning of the ADA/ADAAA, 42 U.S.C. § 12111(8).

75. On July 25, 2023, Defendant intentionally discriminated against Plaintiff by terminating her employment because of her disability and/or because of her need for a reasonable accommodation of her disability.

76. Defendant's proffered basis for terminating Plaintiff's employment—that she could not fulfill the physical requirements of her position without accommodation—is itself a reason rooted directly in her disability. Terminating an employee because she cannot work without a reasonable accommodation, while refusing to provide that accommodation, constitutes disability discrimination under the ADA/ADAAA. *See* 42 U.S.C. §§ 12112(a), (b)(5)(A).

77. Defendant's termination of Plaintiff's employment further violated 42 U.S.C. §12112(b)(5)(B), which prohibits a covered employer from denying employment opportunities to an otherwise qualified individual with a disability when the denial is based on the need of the covered entity to make reasonable accommodation to that individual's physical or mental impairments. Defendant terminated Plaintiff's employment expressly because she required a reasonable accommodation—namely, a first-shift work schedule—that Defendant refused to provide.

78. Defendant invoked Article 31, Section 4 of the successor CBA as the stated basis for Plaintiff's termination, asserting that its leave-of-absence policy permitted termination after one year of leave. However, a CBA leave-of-absence provision does not--and cannot--override Defendant's independent obligation under the ADA/ADAAA to provide a reasonable accommodation before terminating an employee with a disability. Because Defendant never provided Plaintiff with any reasonable accommodation, it cannot rely on the CBA's leave limitation as a lawful basis for her discharge. Moreover, the successor CBA's own terms made a reasonable accommodation available: straight-shift forklift assignments were recognized as

permissible, and the proposed consensual shift trade was CBA-compliant and seniority-neutral. Defendant's termination of Plaintiff therefore cannot be attributed to any genuine CBA limitation, but reflects a failure to fulfill its independent ADA obligations.

79. Defendant's admissions that Plaintiff had been maintained on a leave of absence "pending an improvement in her condition and/or a change in her restrictions" and that she was terminated because Defendant "understood [her] restrictions to be unchanged and permanent," confirm that the termination of the employment relationship was predicated specifically on Plaintiff's disability-related condition and permanent restrictions.

80. But for her disability and her disability-related permanent restrictions, Plaintiff would not have been terminated.

81. As a direct and proximate result of Defendant's intentional discriminatory termination of her employment, Plaintiff has suffered and continues to suffer damages, including but not limited to: (a) lost wages and employment benefits; (b) lost future earning capacity; (c) emotional distress, mental anguish, pain, and suffering; (d) damage to her reputation and professional standing; and (e) other compensatory damages in amounts to be determined at trial.

82. Defendant's conduct was intentional and was undertaken with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to an award of punitive damages pursuant to 42 U.S.C. § 1981a.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A. Grant a permanent injunction enjoining Defendant, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from engaging in any employment practice that violates the ADA/ADAAA;

B. Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for individuals with disabilities and which eradicate the effects of its past and present unlawful employment practices;

C. Order Defendant to make Plaintiff whole by providing appropriate back pay, with prejudgment interest, in amounts to be proven at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices, including but not limited to front pay or reinstatement;

D. Order Defendant to make Plaintiff whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described herein, in amounts to be determined at trial;

E. Order Defendant to make Plaintiff whole by providing compensation for non-pecuniary losses, including but not limited to emotional distress, mental anguish, pain, and suffering, in amounts to be determined at trial;

F. Order Defendant to pay Plaintiff punitive damages for its malicious and reckless conduct described herein, in amounts to be determined at trial;

G. Award Plaintiff her reasonable attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 12205; and

H. Grant such other and further legal or equitable relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY AS TO ALL TRIABLE ISSUES**

Dated this 4th day of May, 2026.

WALCHESKE & LUZI, LLC
Counsel for Plaintiff

s/ *James A. Walcheske*
James A. Walcheske, State Bar No. 1065635

WALCHESKE & LUZI, LLC
1200 N. Mayfair Road, Suite 270
Wauwatosa, Wisconsin 53226
Telephone: (262) 780-1953
Fax: (262) 565-6469
Email: jwalcheske@walcheskeluzi.com